DECISION
Plaintiff appeals the 2009-10 real market value of property identified as Accounts 1654738 and 1654720 (subject property). A telephone trial was held by Magistrate Jeffrey S.Mattson on November 4, 2010. David Carmichael, Attorney at Law, appeared on behalf of Plaintiff. C. Spencer Powell (Powell), MAI, and Greg Hoard (Hoard), principal, Gopura, LLC, testified on behalf of Plaintiff. David Sohm (Sohm), Registered Appraiser 3, appeared and testified on behalf of Defendant.
Plaintiff's Exhibits 1 and 2 and Defendant's Exhibit A were admitted without objection. The parties submitted written closing arguments.
 I. STATEMENT OF FACTS
The subject property is a full-service hotel with 153 guestrooms located on five floors, restaurant with bar, conference and banquet facilities (4,154 square feet), fitness room, and an indoor swimming pool with hot tub located in northwest Springfield, Oregon. (Ptf's Ex 2 at 2, 6.) The 93,391 square foot improved subject property was built on 4.2 acres. (Id.) Hoard testified that a plan for the subject property was developed in 2005, site preparation began in 2006, construction started in early 2007, and a full service hotel opened in June 2008. He testified that he and his partners never would have built the subject property if they "had known *Page 2 
of future economic climate." In response to questions, Hoard testified that $16,500,000 was borrowed for the subject property.
Powell testified that he prepared two appraisal reports for the subject property. The first appraisal report, totaling 265 pages, was prepared for PremierWest Bank as of August 24, 2009. (Ptf's Ex 2.) The second report, identified as an amendment letter and totaling 25 pages, was "limited to establishing a retrospective value as of January 1, 2009 for a potential tax appeal with Lane County." (Ptf's Ex 1 at 1.) Powell concluded a "stabilized real estate value (Land Buildings)" of $14,480,500 and testified that a "retrospective market value" for land and buildings as of January 1, 2009, was $10,480,500. (Id. at 2.)
Powell testified that all three approaches of value, income, sales and cost, need to be considered in appraising the subject property. He contrasted his review to Defendant's single focus on the cost approach. Powell testified that the market occupancy for the subject property as of the assessment date "was determined to be 65%." (Id. at 6.) He attributed the "lackluster" occupancy to "two possible issues; it has not yet reached stabilization or it is suffering from a lack of street frontage, which erodes its exposure and access characteristics." (Id.) Sohm testified that the occupancy for full service hotels is 68.2 percent, citing the "Smith Report."
The parties agree that "[t]ypical hotel properties experience stabilization periods of one to three years. As of January 1, 2009, the subject had been open for business roughly for six months. The property was not yet stabilized." (Id.) Powell testified that "stabilization" for the subject property "should occur by May 31, 2011." (Id. at 7.) The parties agree that the subject property's highest and best use is the "existing full service hotel." (Ptf's Ex 2 at 81; Def's Ex A at 11.) *Page 3 
Powell reviewed the "executive summary" of his amendment letter and the conclusions for site valuation, cost approach and income capitalization approach, emphasizing "USPAP" requires that the income approach "be examined." (Ptf's Ex 1 at 6 — 13.) Powell concluded that the subject property's "effective gross income is estimated to be * * * $7,767,888." (Id. at 11.) He reduced the effective gross income by three categories of operating expenses: departmental expenses, undistributed expenses and fixed expenses which included property taxes, insurance and reserves for replacement. (Id. at 11, 12.) Powell relied on "[s]even capitalization rate comparables," consulted "Korpacz [and] The Hospitality Investment Survey" to determine a capitalization rate of 9.50 percent. (Id.) Powell capitalized "a net operating income of $1,500,219 at 9.50%" to determine "a value of" $15,800,000 (rounded). (Id. (emphasis in original).) Sohm disputed that the income approach is applicable, characterizing that approach as "premature" given the subject property's opening date of July, 2008. He concluded that the effective gross income should be $8,130,578. (Def's Closing Argument at 4.) Sohm testified that Powell's expense ratio of 79.6 percent is "too high," stating that a "better" expense ratio is "74.4 percent" with "2.7 percent for property taxes" omitted. In his closing argument, Sohm revised the expense ratio to 72.7 percent. (Id. at 5.) Sohm computed an overall capitalization including property taxes of 9.59 percent and computed "a stabilized value" of $23,115,000 (rounded). (Id. at 6.) In his closing argument, Sohm writes that "Plaintiff's appraiser" computed a "stabilized market value of the subject property * * * at $22,550,000." (Id.) He states that "plaintiff's appraiser * * * heavily discount[ed] the value using a discounted cash flow analysis with selling costs, a higher terminal capitalization rate, and a discount rate of 12% that is higher *Page 4 
than indicated by the rebounding performance of hotel properties. * * * To so heavily discount the value in the fact of this recovery is incorrect appraisal theory and analysis of the market." (Id.)
Powell's letter amendment included the sales comparison approach, relying on seven comparable sales "presented in the original report, with dates of sale ranging from May 2005 to September 2008." (Id. at 14.) He stated that "[t]he comparables were adjusted upward 1.0% per month based on four sales and re-sales of hospitality properties. After adjusting the sales to reflect the subject's retrospective January 1, 2009 valuation date, the adjusted range in sales price ranges from $48,649 to $199,500 perroom." (Id. (emphasis in original).) Sohm testified that only one of Plaintiff's seven comparable sales is a "truly comparable property" to the subject property, noting that Plaintiff's other comparable sales included limited service hotels, facilities built 30 to 48 years ago, and one sale where the improvements "were immediately demolished for reuse as a retail development, not for operation as a hotel." (Def's Closing Argument at 2, 3.) He concluded that Plaintiff's comparable sale 4 "bears a resemblance to the subject property in number of stories and general design and appeal." (Id. at 2.) Sohm described that comparable property as:
 "a full service hotel and it is relatively new at 7 years old when sold. * * * Even applying a downward adjustment of 25% for location [Lake Oswego, Oregon], this sale still indicates $134,566 and more than supports the real market value of 1-1-2009 for the subject property at $134,445 per room or $20,570,034."
(Id. at 2, 3.) Sohm testified that because "[f]ull service motels do not sell at the growth stage in the life cycle," it is appropriate for an "appraiser [to] question whether a market for the subject property exists at all." (Id. at 1; Def's Ex A at 4.)
Sohm testified that after considering "[a]ll three approaches to value," the "Cost Approach was developed for property tax valuation of this property." (Def's Ex A at 2.) In *Page 5 
support of his reliance and the applicability of the cost approach to the subject property, Sohm cited Appraisal Institute, TheAppraisal of Real Estate, 13th Edition, page 382 and numerous tax court cases. (Id. at 11 through 13.) Using four land sales dating from September 2005 to January 2009, identified as comparable to the subject property, Sohm computed an improved land real market value of $4,086,000 or $19 per square foot. (Id. at 15.) Sohm estimate of land real market value was based on 4.96 acres. (Id. at 14.) Powell concluded a site valuation of $16 per square foot, or $2,930,000, from a range of $15.30 to $33.53 per square foot for four comparable sales and one listing. (Ptf's Ex 1 at 7.) Powell concluded that "[b]ased on the qualitative analysis, the subject is bracketed by" the listing price ($15.30 per square foot) of comparable 5 and comparable sale 1, a February 2008 sale of land located in Springfield that was purchased for $16.85 per square foot. (Ptf's Ex 2 at 85, 86.)
Sohm used `Marshall Valuation Services' computerized Commercial Cost Estimator in conjunction with the ProVal Plus valuation system" to determine the subject property's improvement cost. (Def's Ex A at 16.) To those costs, Sohm added "an allocation of 5%" of "total project direct and indirect costs" for "developer's profit." (Id.) After adding the land real market value of $4,086,000, Sohm concluded that the subject property's real market value as of the assessment date using the cost approach was $23,936,661, "which is rounded to $23,937,000." (Id. at 17.) He concluded that there was no physical depreciation and functional or external obsolescence as of the assessment date. (Id. at 17, 18.)
 II. ANALYSIS
The issue before the court is the 2009-10 real market value of the subject property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, *Page 6 
at *2 (Mar 26, 2003) (citing Gangle v. Dept. of Rev.,13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [1] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
In determining real market value, the highest and best use must be considered. The parties agree that the highest and best use of the subject property is an improved full service hotel.
In determining real market value, Sohm requests that this court consider "the Measure 50 requirement." (Def's Closing Argument at 1.) Sohm states:
 "Prior to Measure 50, we would have placed a lower value on the property in the initial year of operation and annually increased the value as occupancy approached the normal rate for the market. Under Measure 50 this can no longer be done and the only date to set the Maximum Assessed Value is when the `sticks and bricks' are completed."
(Id.) The issue before the court is the subject property's real market value as defined in ORS 308.205(1). There is no statutory reference to a "Measure 50 requirement" in the definition. The court's determination of real market value is based on a consideration of the three approaches of valuation (cost, income, and comparable sales) even if one of the approaches is found to not be applicable. See ORS 308.205(2) and OAR 150-308.205-(A)(2). Powell concluded that all three approaches are applicable and Sohm concluded that only the cost approach is applicable.
A. No immediate market for subject property.
Defendant suggests that there is no "immediate market" for the subject property and the only applicable valuation approach should be the cost approach. (Def's Closing Argument at 7.) *Page 7 
ORS 308.205(2)(c) provides that, if the property has no immediate market value, the test to be applied is the amount that would justly compensate the owner for loss of the property. One of the first questions to answer is whether there is an "immediate market" for the subject property. Powell submitted seven sales that he identified as comparable. Sohm challenged the comparability of those sales to the subject property. Even though the court shares Sohm's concerns, those sales were within a reasonable distance, time, and proximity to the subject property and possessed similar characteristics including affiliation with a hotel chain. The court concludes that there was an "immediate market" for the subject property and the comparable sales approach should be considered in determining the subject property's real market value.
B. Cost Approach
"In its classic form, the cost approach produces an opinion of value of the fee simple interest in the real estate" at stabilized occupancy. The Appraisal Institute, The Appraisal of RealEstate 378 (13th Ed). "For properties that are leased, the cost approach assumes stabilized occupancy and income."Id. at 382. The total cost must include any costs needed to achieve stabilized occupancy. "Because cost and market value are usually more closely related when properties are new, the cost approach is important in estimating the market value of new or relatively new construction." Id. at 382.
Using the cost approach, both appraisers determined the subject property's real market value as of the assessment date to be $22,550,000 and $23,937,000. Sohm concludes the value determined by the cost approach support Defendant's tax roll value of $20,570,034. *Page 8 
C. Comparable Sales Approach
The comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant."Chambers Management Corp and McKenzie River Motors v. Lane CountyAssessor, TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, The Appraisal of Real Estate 335 (12th ed 2001). ORS 308.205(2) provides in pertinent part that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue. The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that:
 "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."
Powell relied on seven sales to compute a "price per room" and an "effective gross income multiplier." In determining the price per room, Powell stated:
 "Deferring towards the low to middle of the narrowed range ($108,357 to $141,000), noting the subject's new condition, excellent overall quality and aesthetic, amenity level, and location near Interstate 5 and the new Sacred Heart Medical Center, a rounded value of $120,000 per room is indicated by the data set."
(Ptf's Ex 2 at 150 (emphasis in original).) "Therefore, based on the price per room analysis, a value of ($120,000/room X 153 rooms)$18,360,000 is concluded based on upon the price per room method. (Ptf's Ex 1 at 14 (emphasis in original).)
In determining the effective gross income multiplier (EGIM), Powell stated:
 "The subject is most similar to Comparable 2 at 3.24. It is a full service, branded hotel located in Hillsboro.
 "A narrowed range of roughly 2.3 to 3.3 is reasonable based on the comparable data. Based on projected income and expenses, the Income Capitalization Approach resulted in an EGIM for the subject of 2.03, primarily due to the elevated level of market expenses required to support a full service facility. In addition, elevated sales and marketing expenses will be required *Page 9 
because of the subject's inferior access and exposure characteristics. A stabilized EGIM of 2.3 was concluded for the subject in the original report and remains reasonable. This results in a stabilized value by the EGIM method of (2.3 X $7,767,888) $17,866,142. rounded to $17,865,000."
(Ptf's Ex 2 at 151; Ex 1 at 15.)
Powell concluded that a "stabilized value estimate by the Sales Comparison Approach [], as of May 31, 2011, is estimated to be:$18,200,000." (Ptf's Ex 2 at 151.)
Hotel properties are commonly grouped into three categories: (1) limited-service hotels; (2) select-service hotels; and (3) full-service hotels, like the subject property. A full service hotel usually offers a higher level of services, including one or more on-site restaurants, recreation facilities and brand affiliation, e.g., Hilton, Marriott, Holiday Inn. As previously noted, the court shares Sohm's concern that Powell's sale properties lack comparability to the subject property. Many of Powell's sale properties were not full service hotels. Powell's comparable sale 4, a seven year full service hotel, Hilton Garden Inn, with access to Interstate 5 was given little consideration even though it possesses many of the same amenities as the subject property. The court finds Powell's conclusions contradictory and confusing. In support of the low to middle range for price per room, Powell cites numerous appealing attributes of the subject property and offers no explanation why those appealing attributes support a low to middle range. In determining the effective gross income multiplier of 2.3, Powell relies on "projected income and expenses" even though he concludes that the subject property is "most similar to Comparable 2 at 3.24 [effective gross income multiplier]. It is a full service, branded hotel [Courtyard by Marriott] located in Hillsboro" which has no access to an interstate or major highway. (Ptf's Ex 2 at 151.) These unresolved issues leave the court giving little weight to Powell's comparable sales approach. / / / *Page 10 
D. Income Approach
"Any property that generates income can be valued using the income capitalization approach." The Appraisal of RealEstate at 447. "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach."Id. at 445. Anticipation is defined as "the perception that value is created by the expectation of benefits to be derived in the future." Id. at 35.
Powell presented an income approach and Sohm critiqued Powell's income approach. The parties agree that reasonable revenue per available room (RevPAR) for the subject property is $128 for a non-suite room and $186 for a suite. (Ptf's Ex 1 at 8; Def's Closing Argument at 4.) There is little difference between the parties for supplemental income. (Ptf's Ex 1 at 11; Def's Closing Argument at 5.)
The parties disagree that market occupancy should be 65 percent. (Ptf's Ex 1 at 6.) In concluding that 65 percent was correct, Powell stated:
 "The subject opened for business in June 2008. Occupancy was lackluster, steadily decreasing from September 2008 (when realizations of the extent of the market downturn hit), through January 2009. As indicated in the original report, the poor performance can be attributed to two possible issues; it has not yet reached stabilization or it is suffering from a lack of street frontage, which erodes its exposure and access characteristics. Typical hotel properties experience stabilization periods of one to three years. As of January 1, 2009, the subject had been open for business roughly for six months. The property was not yet stabilized."
(Id.) Powell's amendment letter was dated March 8, 2010. For comparison, Powell could have included data for each month of 2009 rather than January 2009 to July 2009 and early 2010. Powell relied on post assessment date data for other parts of his analysis. Powell provided data for June 2008, July 2008, June 2008, and July 2009. (Ptf's Ex 1 at 8.) The June year to year comparison shows a more than 12 percent increase whereas the July year to year comparison *Page 11 
shows a more than 9 percent drop. (Id.) Given the assessment date of January 1, 2009, the court places greater weight on the data provided for established competing local hotels.
Sohm believes market occupancy should be 70 percent. Sohm states:
 "For January 1, 2009 the emphasis should be on 2008 occupancy and should place the subject at 70% on a stabilized basis as reported by the localized Smith Travel Research Trend report and the Holiday Inn Express."
(Def's Closing Argument at 4.) Sohm testified that the occupancy for full service hotels is 68.2 percent, citing the "Smith Report." Sohm's testimony differs from his closing argument.
Based on the conflicting evidence, the court concludes market occupancy is 68 percent for evaluating the subject property's capacity to generate future benefits.
The parties differ slightly in the total departmental expenses and agree that the management fee should be 3.5 percent of effective gross income. (Ptf's Ex 1 at 11, 12; Def's Closing Argument at 5.) The parties disagree that undistributed expenses should be 29 percent of effective gross income. (Ptf's Ex 1 at 12.) Sohm concludes:
 "Undistributed expenses are inflated by a higher than typical sales and advertising expense, even though the projection is for the property at stabilized occupancy. Again referring to the Trends table on page 122 of Exhibit 2 with emphasis on the `Mountain/Pacific' column and the `$100 to $200' column, the appropriate expense factor for undistributed expenses would be 25%."
(Def's Closing Argument at 5.) In Plaintiff's Exhibit 2 at 122, Sohm skipped over the column labeled "Trends — Full Service Under 150 rms," listing a total of 28.30 percent for undistributed expenses. The subject property has 145 rooms and eight suites, a total that is three more than 150. Given that the referenced data is a comparison of location, number of rooms, and price per room, the court concludes that 27 percent of effective gross income is reasonable for undistributed expenses.
Powell included property taxes in fixed expenses. This court has indicated a preference for not including property taxes in expenses. Property tax expense should be added to the *Page 12 
capitalization rate. After removing property taxes from fixed expenses, the court accepts 1.66 percent of effective gross income as a reasonable amount for fixed expenses.
Relying on "seven capitalization rate comparables," Powell concluded that a capitalization rate of 9.50 percent was reasonable. (Ptf's Ex 1 at 12.) Sohm concluded that because the "[d]ata used by plaintiff's appraiser from comparable sales has been shown to be based on assumptions and inaccurate information," the overall capitalization rate was overstated. (Def's Closing Argument at 6.) He determined that "[t]he Korpacz Investment Survey cited on page 133 of Plaintiff's Exhibit 2" listing an overall capitalization rate of 8.61 percent is appropriate for the January 1, 2009 assessment date. (Id.) Sohm added a property tax rate of .979 percent to 8.61 percent to determine an overall capitalization rate of 9.59 percent. (Id.) The 8.61 percent rate fits within the range for four of Powell's six computed overall rates computed from those sales. (Ptf's Ex 2 at 132.) The seven computed rate was an "estimated rate." Unfortunately many of the sales occurred months prior to the assessment date and there is no evidence relating those sales to January 2009. (Id.) Based on the evidence, the court accepts Sohm's rate rounded to 9.6 percent.
After accounting for the noted differences, the court concludes that using the income approach the subject property's real market value as of the assessment date is $20,300,000 (rounded).
E. Discounted Cash Flow Analysis
Powell states that the discounted cash flow method "involves discounting annual income and the reversionary value of a property to a present value." (Ptf's Ex 1 at 16.) Powell used actual 2008/2009 data, projected estimates for two years and determined "a reversionary value of the property at the end of the remaining two-year absorption period * * * based upon an 10.50% *Page 13 
terminal capitalization rate, which is 100 basis points higher than the stabilized rate, a reflection of higher risk * * * [plus] a sales cost of 5% [was] subtracted from the amount in the reversion year." (Id.) Powell concluded that an appropriate discount rate was 12 percent, a rate higher than the indicated national full service hotel properties because "the retrospective valuation includes roughly six months of operating history, which results in more risk to a potential investor." (Id. at 16, 17.) Using the subject property's actual operating history supplemented by national data as stated in Powell's Income Capitalization Approach Summation Table, Powell determined an "`as is? market value, prior to stabilized occupancy and ADR, as of January 1, 2009, of:$13,000,000." (Ptf's Ex 1 at 17 (emphasis in original).)
There are two concerns with the "as is" value determined by Powell. First, Powell's "as is" value does not include a stabilized income for the subject property which would be the one critical factor in an arm's length transaction between a willing buyer and willing seller. Second, in determining a property's real market value, the Oregon Supreme Court held that using a valuation method that incorporates "[t]he developer's discount does not assess the value of the properties if put to their highest and best use, but reduces their value to arrive at the value of the properties considered as an investment. Investment is not the highest and best use of the properties." First Interstate Bank v. Dept. ofRev., 306 Or 450, 454-455, 760 P2d 880 (1988). In the case before the court, the parties agree that the subject property's highest and best use is a full service hotel. To the extent Powell determined an investment value, Powell may not have determined a value that incorporates the subject property's highest and best use as a full service hotel. The court will give little weight to Powell's indicated discounted cash flow value. *Page 14 
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court gives most weight to the parties' cost approach and some weight to Plaintiffs income approach as revised by the court. The court concludes that the subject property's 2009-10 tax roll value, $20,570.034, is the best estimate of real market value as of the assessment date. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs appeal is denied.
Dated this ____ day of May 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Presiding Magistrate Jill A.Tanner on May 4, 2011. The Court filed and entered this documenton May 4, 2011.
[1] References to the Oregon Revised Statutes (ORS) and Oregon Administrate Rules (OAR) are to year 2007. *Page 1