IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

MARIA MITCHELL,                              )
                                             )
            Plaintiff,                       )      TC-MD 220366R
                                             )
      v.                                     )
                                             )
CLATSOP COUNTY ASSESSOR,                     )
                                             )
            Defendant.                       )      **DECISION**

Plaintiff appealed Defendant's tax roll values for Property Tax Accounts 9862 and 9829 (subject properties) for the 2019-20, 2020-21 and 2021-22 tax years. A remote trial was held on March 8, 2023. Steve Anderson appeared on behalf of Plaintiff. W. Paul Jackson (Jackson), an MAI appraiser, testified on behalf of Plaintiff. Christopher Leader (Leader) and Steve Gibson, Clatsop County appraisers, appeared on behalf of Defendant. Leader testified on behalf of Defendant. Plaintiff's Exhibit 1 and Defendant's Exhibits A and B were received into evidence without objection.

## I. STATEMENT OF FACTS

Plaintiff's appeal concerns two adjacent tax lots, Account 9829 (also referred to as tax lot 2100), a 1.12-acre lot improved by a 792-square foot garage built in 1940, and Account 9862 (also referred to as tax lot 4900), a 1.04-acre (45,302-square foot) lot with a 1,347-square foot single-family dwelling built in 1914, located in Seaside, Oregon. The subject properties are situated along an estuary where the Necanicum River and Neawanna Creek converge and flow into the Pacific Ocean in the northern end of Seaside. A city plat map divides the subject properties into a total of 13 potential lots, although lots 4 and 5 in Account 9862 are located in a flood zone, which the parties agree renders them unbuildable.



The plat map (above) includes two unbuilt streets along the waterfront that may not be buildable due to their flood zoning, a partially built street (Mason Street) running from north to south within Account 9862, and a partially improved street separating the two tax lots (Neawanna Street).

The parties agree that the highest and best use of the lots is for development of a subdivision containing nine single-family residences.[1]  They also concur that the sales comparison approach is the appropriate valuation method despite the absence of recent sales of comparable empty lots near the subject properties.  Additionally, the parties agree on the existing tax roll values for the improvements.

A.    *Plaintiff's Evidence*

Jackson prepared six retrospective appraisals for the subject properties, one for each tax account in each of the three tax years at issue.  Jackson evaluated the highest and best use as a

---

[1] The parties disagree whether within Account 9862, unbuildable lots 4 and 5 can be combined with lots 3 and 6, respectively, to make two larger lots and effectively render lots 3 and 6 as waterfront properties.

single lot for redevelopment of a single-family residence and as land for subdivision development, ultimately favoring the site for residential development.

For illustrative purposes, the court focuses on the 2019-20 tax year. For Account 9862, Jackson selected five bare land parcel sales, opting for lower-priced properties due to the older homes nearby potentially limiting higher-end improvements. Four sales were vacant lots on Edgewood Street in southern Seaside, near the Necanicum River and several blocks from the ocean. The fifth property was located on Highland Drive in a residential area in southern Seaside and not adjacent to water. Each sale was approximately 0.17 acres, ranging in price from $17.56 to $22.15 per square foot. Jackson adjusted the sales price down by 10 percent for superior location because of their proximity to commercial activity. He noted a 6 to 16 percent appreciation in Seaside residential properties over the last three years and applied an 11 percent annual appreciation rate to adjust for comparable properties' time of sale. Jackson also accounted for a waterfront premium of $100,000 to $150,000 per lot, applying a $150,000 premium for each of the two lots. He did not classify lots 3 and 6 as waterfront due to a proposed extension of Mason Street, potentially obstructing direct water access. Based on lot areas and premiums, Jackson valued the lots at $767,523.

Jackson applied a discounted cash flow analysis due to infrastructure requirements and time to sellout the lots. He considered five subdivision development costs from a rounded $51,400 to $67,500 but estimated $45,000 per lot given the existing infrastructure. After factoring in sellout expenses over six months and a discount rate, Jackson estimated the lots' value at $427,000. His report reconciled this analysis with a highest and best use as a single undivided property with a value of $400,000, although he later acknowledged this as an error during cross-examination.

For Account 9829, the parties agreed that there are seven buildable lots, with two considered waterfront. Similar analyses were conducted for Account 9829 across the three tax years at issue, concluding with a value of $556,000 for the 2019-20 tax year (ignoring the reconciliation).

The following table displays Jackson's real market value conclusions for each property tax account during the tax years at issue:

| Tax Year | Account Number | Real Market Value |
|----------|----------------|-------------------|
| 2019-20 | 9862 | $427,000 |
| 2019-20 | 9829 | $556,000 |
| 2020-21 | 9862 | $461,000 |
| 2020-21 | 9829 | $620,000 |
| 2021-22 | 9862 | $418,000 |
| 2021-22 | 9829 | $529,000 |

B.    *Defendant's Evidence*

Leader testified he has been an appraiser since 2003 and has worked for Defendant since 2011, currently serving as an appraisal supervisor. Defendant agrees with Plaintiff that the city's plat map shows 13 potential individual lots within the subject properties, but only 11 are buildable due to setback requirements in the flood zone area. Leader asserts that the two unbuildable lots situated within Account 9862, lots 4 and 5, could be merged with lots 3 and 6 to convert the interior lots into waterfront properties. In Leader's opinion, the proposed extension of Mason Street between the lots could be disregarded, despite an email from the City Attorney indicating that platted streets are generally not vacated.

Leader developed retrospective values for the subject properties by finding an opinion for the 2019-20 tax year and adjusting the values upward for the next two years. He testified that he could not find recent comparable sales of vacant land adjacent to an estuary. Therefore, Leader considered the sale of five improved properties with estuary frontage, adjusted for the time of

sale, and extracted the value of the improvements to determine a bare land value for each sale. Leader then calculated the value of the lots per waterfront footage. Leader determined the vacant lot value by discounting improvements for depreciation and subtracting $19,200 from each sale for landscaping and on-site development. He gave less weight to the highest value comparable property and concluded that $3,700 per frontage foot should be applied to homesites with more than 100 feet of estuary frontage, and $5,700 per frontage foot for the two homesites with 50 feet of estuary footage. Leader found three interior lots near the subject properties with average recent sales of $78,081. He assumed that two of the unbuildable lots adjacent to the waterfront would be combined with the lots next to them, converting them to waterfront values.[2] Leader also assumed that the lot with the greatest estuary frontage would be valued without deduction for development costs, while the remaining lots would be discounted by 25 percent or $71,250 per lot. Leader concluded the 2019-20 real market value for Account 9862 was $1,205,572. Leader trended that value forward for the 2020-21 and 2021-22 tax years using 7 and 13 percent appreciation rates, respectively, resulting in real market values of $1,289,962 and $1,457,657.

For Account 9829, Leader valued the lots assuming two waterfront lots and five interior lots. Using the same methodology, Leader valued the first lot at full value, $384,800, and the second lot with a 25 percent discount, resulting in a value of $288,600. He valued each of the five interior lots at $80,000 discounted by 25 percent, resulting in values of $60,000 each. Leader's total real market value for the 2019-20 tax year amounted to $993,702. He projected those values forward for the 2020-21 and 2021-22 tax years to $1,063,261 and $1,201,485, respectively.

---

[2] Leader submitted a letter from the City of Seaside indicating the streets closest to the water would probably not be developed. The email was vague about whether the street between the two undevelopable lots (Mason Street) would be developed.

Based on his conclusions of value for each property tax account at issue, Leader argues Plaintiff failed to show a reduction from the roll values of at least 20 percent, and thus, the court lacks authority to change the roll values under ORS 305.288(1).[3]

## II. ANALYSIS

The issue in this case is the real market value of the subject properties for tax years 2019-20, 2020-21, and 2021-22. Because the parties agreed that the highest and best use of the properties is as residential lots, the focus of the appraisals was on valuing the 11 individual platted and buildable lots. The burden of proof falls on Plaintiff, the party seeking affirmative relief from the tax assessment. *See* ORS 305.427.[4] To prove her case, Plaintiff must demonstrate by a "preponderance of the evidence" that she is entitled to relief, which means showing that her claims are "more probably true than false[.]" *Cook v. Michael,* 214 Or 513, 527, 330 P2d 1026 (1958). Plaintiff's burden is modified here since she did not appeal to the board of property tax appeals for any of the tax years at issue, as ORS 309.100 otherwise prescribes. Consequently, she must prove the real market value of the subject properties was at least 20 percent below the roll values for the court to have authority to order a change to the roll value pursuant to ORS 305.288(1).[5]

/ / /

---

[3] Tax Account 9829 RMV Roll Values: 2019-20, $1,199,652; 2020-21, $1,297,275; 2021-22 $1,491,472. Tax Account 9862 RMV Roll Values: 2019-20, $1,414,709; 2020-21, $1,531,327; 2021-22, $1,769,818.

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

[5] The court notes that Defendant never objected to the inclusion of Tax Account 9829 in Plaintiff's appeal, even though it did not contain a "single-family dwelling" as required by ORS 305.288(1)(a). However, this court stated in *Gray v Department of Revenue*, 23 OTR 220, 226 (2018): "[t]he Tax Court recently has stated, in *Work v. Dept. of Rev*. [22 OTR 396 (2017)] that motions to dismiss for failure to satisfy the requirements of ORS 305.275 and 305.288 are properly characterized as motions to dismiss for failure to state a claim, rather than motions to dismiss for lack of subject matter jurisdiction[.]" Per Tax Court Rule 21 G(2), defenses that a claim is time barred are waived if not made by motion. Further, a defense of failure to state a claim is certainly waived if not presented at trial. *See id*.

Real market value for the purposes of tax assessment is defined by ORS 308.205(1) as:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

Ultimately, this court has jurisdiction to determine real market value "without regard to the values pleaded by the parties." ORS 305.412.

A.    *The Parties' Valuation Methodology*

The primary valuation challenge here stems from the absence of recent vacant lot sales near the subject properties. Plaintiff addressed the challenge by selecting vacant lots in a different part of town, adjusting for location, time of sale, and a significant upward adjustment for waterfront lots. Plaintiff then applied a discounted cash flow analysis to consider the time and expense required to develop the property, resulting in a final conclusion of value.

Defendant's strategy was to select property sales in close proximity to the subject properties containing improvements, adjust to the assessment date, and extract the on-site development by using Defendant's depreciated replacement costs, subtracting out landscaping, and trending the real market values for each successive year. Defendant kept the value of the first lot at the full market value and reduced the other lots by 25 percent to account for development costs. Defendant's conclusion of value is lower than the roll value, however, the difference is less than 20 percent and thus Defendant asserts the court does not have authority under ORS 305.288(1) to order a change to the roll value.

1. *Subdivision residual analysis*

Jackson's strategy in selecting property sales outside the immediate vicinity appears viable due to a lack of nearby sales of vacant lots. The selections are concentrated in one area and differ in urban locations and without a direct waterfront view, but adjustments can overcome

these challenges. Jackson's $150,000 upward adjustment for waterfront was supported by his experience. However, the court agrees with Defendant's critique that two additional buildable lots in Account 9862 would effectively be waterfront properties, resulting in an increase of $300,000 to $767,523 for the 2019-20 tax year for Account 9862, resulting in a total lot value of $1,067,523.

    2. *Discounted cash flow (DCF)*

    Jackson applied a DCF analysis to address the delay in selling all of the lots in the subdivision, for the expense of development of water, sewer, electricity, and streets, sellout expenses, and a discount for the time value of money. That adjustment lops more than 44 percent from the lot values determined above.

    In analyzing the DCF, this court has previously looked to the following description as informative:

> "[W]here the gross revenue from future developable land sales is estimated (using the values concluded in the Sales Comparison Approach), development and sales costs are deducted, and the anticipated future cash flows are discounted to a present value at an appropriate rate to reflect the as-is value of the property * * *."

*GLC-South Hillsboro, LLC v. Washington County Assessor*, TC-MD 180141R, 2021 WL 2290314 at *2 (Or Tax M Div, June 4, 2021) (Citation omitted). However, this court has traditionally rejected the application of the DCF on smaller subdivisions. *First Interstate Bank v. Dept. of Rev.*, 10 OTR 452, 457 (1987), *aff'd*, 306 Or 450, 760 P2d 880 (1988); *Powell Street I, LLC v. Multnomah County Assessor*, 365 Or 245, 260, 445 P3d 297 (2019); *Park Development, Inc. v. Clackamas County Assessor*, TC-MD 150187N, 2015 WL 7753162 at *6 (Or Tax M Div, Dec 1, 2015). The following quote is instructive:

> "Reduction by this method [DCF] results in a determination of the properties' value to the current owner or their value as an investment. This is not the market value, which is the price that each property would receive on the open market.

OAR 150-308.205(A)(1)(a). While in certain circumstances the value to the owner might equal the market value, the value to the owner cannot be equated with the market value.

> "There is no dispute that the highest and best use of each lot is for the construction of a single-family residence. Only by valuing the property at its highest and best use can the true cash value of a property be determined. *Sabin v. Dept. of Rev.,* 270 Or 422, 426-27, 528 P2d 69 (1974). The developer's discount does not assess the value of the properties if put to their highest and best use, but reduces their value to arrive at the value of the properties considered as an investment. Investment is not the highest and best use of the properties."

*First Interstate Bank*, 306 Or at 454-55.

In this case, the parties agree the highest and best use is as a residential subdivision, selling individual lots rather than as an investment property. Per the cases cited above, Jackson's DCF approach does align with court precedent. This court's holding in *GLC-South Hillsboro* was an exception due to the unique circumstances of the property's size and potential bulk purchase by developers or investors. Consequently, the court rejects Jackson's DCF adjustment.

3. *Development costs*

Despite rejecting the DCF adjustment, the court acknowledges potential development costs associated with maximizing the value of the lots. A potential buyer would consider these costs, especially if infrastructure like water, sewer, and electricity is not already in place. Plaintiff's estimate of $45,000 per property ($495,000 in total) based on comparable subdivision developments is more persuasive than Defendant's blanket percentage beginning with the second property.

4. *Determination of the subject properties' values*

Considering Plaintiff's sales comparables for Account 9862, upward adjustments for waterfront properties, rejection of the DCF adjustment, and subtracting development costs, the court finds the 2019-20 real market value of Account 9862 at $887,523 ($767,523 + $300,000 -

$180,000). (Ex 1 at 50.) Following the same logic, the 2020-21 and 2021-22 tax roll values for lot 9862 are $932,049 ($812,049 + $300,000 - $180,000) and $876,392, respectively. (*Id*. at 170, 288.) With regard to lot 9829, the court finds the 2019-20, 2020-21, and 2021-22 tax year real market values at $865,808 ($1,180,808 - ($45,000 x 7)), $949,166, and $831,070, respectively. (*Id*. at 110, 228, 347.)

### III. CONCLUSION

After careful consideration, the court finds the real market values as listed above. Additionally, the court finds that in accordance with ORS 305.288(1)(b), the real market values determined differ from the real market values on the assessment and tax roll for each of the tax years at issue by 20 percent or greater. Consequently, the court possesses the authority to order reductions to the tax roll values. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted. Property Tax Accounts 9862 and 9829 real market values for the 2019-20, 2020-21, and 2021-22 tax years, should be adjusted in accordance with this Decision.

Dated this _____ day of May, 2024.

_____
RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Davis and entered on May 6, 2024.*